

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 27, 2024 Session

**IN RE CIARA B.**

**Appeal from the Juvenile Court for Houston County**
**No. 2021-JV-17     William S. Vinson, III, Judge**

_____

**No. M2022-01252-COA-R3-PT**

_____

Father, who is serving an eight-year sentence on a rape conviction, appeals the termination of his parental rights. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which KENNY ARMSTRONG, and CARMA DENNIS MCGEE, JJ., joined.

Michael R. Meise, Dickson, Tennessee, for the appellant, Terry B.

Jonathan Skrmetti, Attorney General and Reporter; Mara L. Cunningham, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

**MEMORANDUM OPINION[1]**

**I. FACTUAL AND PROCEDURAL BACKGROUND**

---

[1] Rule 10 of the Rules of the Court of Appeals of Tennessee provides:

This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION," shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

On June 8, 2020, Petitioner/Appellee the Tennessee Department of Children's Services ("DCS") received a referral for a child, Ciara B. (born in August 2016), reported to be walking alone in the woods.[2] According to a later protective custody order, law enforcement responded and found the home to "deplorable" and the child to be filthy, covered in ticks, and with a circular burn mark on her arm. The child reported to law enforcement that her mother, Christina M. ("Mother") burned her with a cigarette. Law enforcement also reported that Mother and her boyfriend did not seem concerned about the child. On the same day, a drug screening indicated that both Mother and her boyfriend were positive for illegal drugs, including methamphetamine. Mother was arrested and charged with aggravated child abuse and neglect.

DCS therefore filed a petition to declare the child dependent and neglected and for temporary legal custody of the child on June 10, 2020, in the Houston County Juvenile Court ("the trial court"). The trial court entered a protective custody order placing the child in DCS custody on the same day. The trial court entered a second order on June 30, 2020, maintaining the child in DCS custody and noting that the child's father, Respondent/Appellant Terry B. ("Father"), was incarcerated and had not yet been served with the dependency and neglect petition.

On October 6, 2020, the trial court entered an order finding clear and convincing evidence that the child was dependent and neglected. Father remained incarcerated at the time of the hearing on the dependency and neglect petition. Father was not present for the final hearing and it does not appear that he was represented by counsel at that time.

Eventually, on April 1, 2021, DCS filed a petition to terminate the parental rights of Mother and Father.[3] Trial on the petition was set for April 2022, but was continued on the day of trial on the request of Father's counsel when he was not transported from his correctional facility. The trial court granted Father's request for a continuance and the trial was rescheduled for June 28, 2022. Mother did not appear for the hearing; Father appeared via Zoom.

Only three witnesses testified at trial. Father testified first. Father admitted that he was currently serving an eight-year sentence in the Hardeman County Correctional Facility for rape.[4] Father was arrested on this charge in September 2017, when the child was a little over one year old. At the time of his arrest, the child was in Mother's custody; however, Father testified that he knew that Mother was abusing drugs during that time. He has been continuously incarcerated since his arrest on the rape charge, but testified that his sentence

---

[2] In cases involving the termination of parental rights, it is this Court's policy to remove the full names of children and other parties, to protect their identities.

[3] Mother's rights were terminated by the trial court, but she has not participated in this appeal.

[4] Father's conviction showing that he plead *nolo contendere* to the rape on November 28, 2018, was admitted as an exhibit.

is expected to be completed in March 2023.[5]

At the time of Father's arrest, he was already on the sex offender registry.[6] Indeed, Father was charged with violating the sex offender registry on or about February 29, 2016 when he moved without giving proper notice.[7] Father admitted that, in February 2016, he assaulted Mother when he "hit her in the butt with a broom." Father admitted that Mother was pregnant with the child during this incident and that the child was a planned conception. Father was convicted of the sex offender registry violation and sentenced to eleven months, twenty-nine days with credit for time served. Although Father was also charged with misdemeanor domestic violence regarding his assault on Mother, this charge was dismissed.

Father testified that he has worked to improve himself while in prison by taking parenting classes, a behavioral class, and a "HiSET class." Moreover, Father claimed that he attempted to send letters and photographs to DCS for the child, but DCS never responded. Father also testified that he strongly desires the opportunity to parent his child upon his release from incarceration.

Father also testified that while he is unable to pay child support due to his incarceration, approximately $700.00 was garnished from his federal stimulus check in April 2021. Father admitted, however, that he received two earlier stimulus checks and that he did not remit any amount for the child's benefit from those distributions; instead, those checks, one of which totaled $2,200.00, were placed on his prison account by a family member.

Father also testified that he has looked into various places to live when he is released from incarceration, but he could not give any specifics. Father admitted that it would take "a little time" for him to get on his feet after he is released. Still, Father claimed that he loves the child and wants the opportunity to parent her as he did prior to his incarceration.

Amelia Duckett, the child's DCS family service worker, also testified. Ms. Duckett testified that the child was removed from Mother and her boyfriend's custody due to neglect and suspected drug exposure.

According to Ms. Duckett, Father had not provided clothing, letters, or "anything of that nature" for the child during the custodial period.

---

[5] During the March 2024 oral argument in this appeal, counsel for Father stated that Father hoped to be released in July 2024.

[6] The record does not indicate what crime placed Father on the sex offender registry.

[7] Father testified that his failure to update his address was inadvertent and that he was only living in the new address for a few days before "they violated me for the registry." The affidavit of complaint regarding this crime states that Father admitted he was living at the new address for over a month.

Ms. Duckett testified that the child was placed with a foster family, where she is bonded to her foster parents and foster sibling. According to Ms. Duckett, it would be detrimental to remove the child from this home and place her with either of her parents, as neither have made significant lasting changes in their lives.

The child's foster mother, Angelia E. ("Foster Mother") also testified. The child was placed with Foster Mother and her husband on June 10, 2020, and has lived continuously with the family since that time. According to Foster Mother, the child is doing "amazing" in the home and in school. Foster Mother testified that the child is bonded to her, her husband, and her foster brother.[8] In contrast, the child has never asked to call or visit with Father. Foster Mother stated that if the child becomes available for adoption, she and her husband want to adopt the child.

The trial court entered a written order terminating both parents' parental rights on August 2, 2022. As to Father, the trial court found clear and convincing evidence of two grounds for termination: (1) abandonment by an incarcerated parent through wanton disregard; and (2) failure to manifest an ability or willingness to parent. The trial court further found that termination was in the child's best interest. From this order, Father now appeals.[9]

## II. ISSUES PRESENTED

Father raises the following issues, which are taken from his brief:

1. The trial court erred in finding clear and convincing evidence Father abandoned the child due to wanton disregard.

2. The trial court erred in finding clear and convincing evidence Father failed to manifest an ability and willingness to care for the child.

3. DCS made no effort to assist the father throughout all proceedings, thereby not meeting the **In re Kaliyah** standard necessary to weigh reasonable efforts as a factor in determining if terminating the father's parental rights is in the best interest of the child.

4. Should an incarcerated parent's parental rights be terminated when he was never appointed counsel throughout the dependency and neglect proceedings, when the department made no efforts to assist him throughout the proceedings, and when he

---

[8] The child's foster brother is also the child's biological half-sibling, as he was previously adopted by the foster family and shares the same biological mother with the child.

[9] There was an issue with regard to the timeliness of Father's notice of appeal. The trial court eventually granted a motion for relief under Rule 60.02 of the Tennessee Rules of Civil Procedure, which rendered Father's notice of appeal timely.

was never transported to court or arranged to appear telephonically until the day of the termination of parental rights hearing?

### III. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). Therefore, "parents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *Id.* at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (quotation marks and citations omitted). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (quotation marks and citation omitted).

In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which [the] state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *See In re Valentine*, 79 S.W.3d at 546. "Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases." *In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018). The clear and convincing evidence standard applicable here is "more exacting than the 'preponderance of the evidence' standard, although it does not demand the certainty required by the 'beyond a reasonable doubt' standard. To be clear and convincing, the evidence must eliminate any substantial doubt and produce in the fact-finder's mind a firm conviction as to the truth." *In re S.R.C.*, 156 S.W.3d 26, 29 (Tenn. Ct. App. 2004) (internal citation omitted).

Because of the high standard of proof in termination cases, the standard of review is somewhat different than our typical standard under Rule 13 of the Tennessee Rules of Appellate Procedure. As the Tennessee Supreme Court recently explained:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence

preponderates against it. ***In re Taylor B.W.***, 397 S.W.3d 105, 112 (Tenn. 2013); ***In re Justice A.F.***, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002); ***In re Justice A.F.***, 2012 WL 4340709, at *7 (citing ***In re M.L.D.***, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).

Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. ***In re Taylor B.W.***, 397 S.W.3d at 112; ***In re Audrey S.***, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); ***In re Justice A.F.***, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See **In re M.L.P.***, 281 S.W.3d 387, 393 (Tenn. 2009); *see also **In re Samaria S.***, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. ***In re Angela E.***, 303 S.W.3d [240,] 246 [Tenn. 2010)].

***In re Markus E.***, 671 S.W.3d 437, 457 (Tenn. 2023).

## IV. ANALYSIS

### A. Grounds for Termination

In this case, the trial court terminated Father's parental rights on two grounds: (1) abandonment; and (2) failure to manifest a willingness and ability to parent. We will consider each ground in turn.

### 1. Abandonment

We begin with abandonment by an incarcerated parent through wanton disregard. Abandonment is one of several grounds for termination recognized by our legislature. *See* Tenn. Code Ann. § 36-1-113(g)(1). In turn, the version of Tennessee Code Annotated section 36-1-102 applicable here defines "abandonment" as, inter alia,

(iv) A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:

. . . .

    (*c*) [] engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(iv). This statutory language balances the idea that "incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child[,]" with the notion that "incarceration alone in not an infallible predictor of parental unfitness." ***In re Audrey S.***, 182 S.W.3d at 866. Thus, "incarceration alone [is not] a ground for the termination of parental rights." ***Id.*** Instead, a parent's incarceration acts as a "triggering mechanism" that allows courts to examine the child's situation more closely, so as "to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." ***Id.***

    Although section 36-1-102(1)(A)(iv) does not specifically define "wanton disregard," "[t]he actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." ***In re Anthony R.***, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). While "incarceration alone is [typically] an insufficient basis for establishing the ground of wanton disregard,"[10] ***In re Trinity H.***, No. M2020-00440-COA-R3-PT, 2020 WL 5110312, at *9 (Tenn. Ct. App. Aug. 28, 2020), this Court has held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child" can constitute conduct demonstrating a wanton disregard for the child. ***In re Audrey S.***, 182 S.W.3d at 867–68.

    Additionally, in considering whether the parent's behavior exhibited wanton disregard for the child's welfare, we may look beyond the four months immediately preceding incarceration, so long as the parent knew of the child's existence. *See id.* at 865 ("This test has no analog to the first statutory definition of abandonment, and it is not expressly limited to any particular four-month period."); ***In re Anthony R.***, 2015 WL 3611244, at *3 ("Logically, a person cannot disregard or display indifference about someone whom he does not know exists."). To be sure, "Tennessee courts may consider the parent's behavior throughout the child's life, even when the child is in utero." ***In re Zane W.***, No. E2016-02224-COA-R3-PT, 2017 WL 2875924, at *8 (Tenn. Ct. App. July 6, 2017) (citing ***In re A.B.***, No. E2016-00504-COA-R3-PT, 2017 WL 111291, at *10 (Tenn. Ct. App. Jan. 11, 2017) ("For a child in utero, we primarily have found wanton disregard where a parent, after learning of the pregnancy, commits the crime for which he or she is subsequently incarcerated.")).

---

[10] Isolated conduct can be sufficient to constitute wanton disregard, however, where "the conduct was particularly egregious and directly threatened the child's safety[.]" ***In re Johnathan M.***, 591 S.W.3d 546, 557 (Tenn. Ct. App. 2019).

As an initial matter, there can be no dispute that Father was incarcerated continuously for the four months preceding the filing of the termination petition. The only question then, is whether Father's pre-incarceration conduct amounts to a wanton disregard for the welfare of the child. We conclude that it does.

Father does not dispute that, based on an incident that occurred in September 2017, he was convicted of rape in November 2018, and was serving an eight-year sentence at the time of the termination trial.[11] He also does not dispute that he assaulted Mother while she was pregnant with the child and, around the same time, violated the rules of the sex offender registry, which he was already subject to prior to the current rape conviction. While the child was not born at this time, it does appear that Father knew about the child's existence, as he emphasized at trial that her conception was planned by Father and Mother. *See **In re Zane W.***, 2017 WL 2875924, at \*8. So then, during the relevant period, Father has committed various bad or otherwise criminal acts and has repeatedly put himself at risk of incarceration.

Thus, despite professing his desire to parent the child and be in her life, Father repeatedly took action that he should have known would result in him being removed from the child's life. Father's actions are particularly egregious because his enrollment on the sex offender registry indicates that he had previous involvement with the criminal justice system and knew that the consequences for future criminal activity could be serious. And in engaging in behavior that posed a risk of incarceration, Father left the child with a parent who he knew abused illegal drugs.[12] Obviously, this resulted in the child being the victim

---

[11] In his brief, Father makes no argument concerning the effect of his *nolo contendere* plea to the rape charge. *See generally **State v. Albright***, 564 S.W.3d 809, 817–18 (Tenn. 2018) (holding that a plea of nolo contendere "is tantamount to an admission of guilt for purposes of the case in which the plea is entered. . . . [A] conviction following a plea of nolo contendere has all the effects of a plea of guilty insofar as the purposes of the case are concerned. The only difference of substance is that a conviction following the entry of a plea of nolo contendere cannot be used against the accused as an admission in any civil suit for the same act." (quoting **Teague v. State**, 772 S.W.2d 932, 943 (Tenn. Crim. App. 1988)). Nor does he in any way deny that he committed rape. Indeed, at trial he explained his plea as follows: "I did a -- I took a -- I guess it was what you call -- not a prenup [sic], but I did plead guilty, but **I didn't say I was innocent**." (Emphasis added). His argument on appeal is simply that this "offense," having occurred while the child was in the custody of Mother, was merely reckless, but not wanton because it does not meet the "extreme" degree of culpability required. To the extent that Father is arguing that a rape does not constitute a wanton act, our cases hold the opposite depending on the circumstances at issue. *See, e.g.*, **In re T.L.G.**, No. E2014-01752-COA-R3-PT, 2015 WL 3380896, at \*3 (Tenn. Ct. App. May 26, 2015) (concluding that sexual acts against one's own child, leading to a lengthy prison sentence, "without question reflects a wanton disregard for the Child's welfare"); **In re G.M.H.**, No. M2006-02665-COA-R3-PT, 2007 WL 1527003, at \*3 (Tenn. Ct. App. May 24, 2007) (finding that sexual abuse and child rape of a step-sibling exhibited wanton disregard for the welfare of the parent's children). Regardless, the decision in this case does not rest on the facts that led to Father's rape conviction or on that crime alone, but on Father's conduct as an aggregate prior to his incarceration.

[12] Immediately prior to his incarceration, Father only kept the child on weekends for a period of

of serious neglect by Mother. "[A] parent's poor judgment and bad acts that affect the children constitute a wanton disregard for the welfare of the children." ***State, Dep't of Children's Servs. v. Hood***, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009). Under these circumstances, the trial court did not err in concluding that DCS established this ground for termination by clear and convincing evidence.

## 2. Failure to Manifest an Ability and Willingness to Parent

The trial court also determined that Father failed to manifest an ability and willingness to assume custody or financial responsibility of the child under Tennessee Code Annotated section 36-1-113(g)(14). Parental rights may be terminated where:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14).

The ground contains two distinct elements that must be proven by clear and convincing evidence. The first requires proof that the parent has failed to evince either an ability or a willingness to assume custody of the child. ***In re Brylan S.***, No. W2021-01446-COA-R3-PT, 2022 WL 16646596, at *8 (Tenn. Ct. App. Nov. 3, 2022) (citing ***In re Neveah M.***, 614 S.W.3d 659, 677 (Tenn. 2020)). The second requires proof that placing the child in the parent's custody poses "a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14).

In his brief, Father admits that he currently has no ability to care for the child, but argues that he should be given the opportunity to prove his ability once he is released. Respectfully, we disagree. "Although we may consider evidence both before and after the petition was filed, a parent's ability and willingness may be measured as of the time the petition is filed." ***In re Jayda J.***, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at *14 (Tenn. Ct. App. July 21, 2021) (internal citations and quotation marks omitted). Here, at the time the termination petition was filed, Father had no ability to assume custody of the child due to his incarceration. *Compare* ***In re Ahleigha C.***, No. E2020-0016830-COA-R3-PT, 2021 WL 3401021, at *7 (Tenn. Ct. App. Aug. 4, 2021) (holding that inability to parent cannot be satisfied by proof of incarceration alone), *with* ***In re Ahleigha C.***, 2021 WL 3401021, at *10 (McGee, J., dissenting) (concluding that incarceration prevents a parent from taking custody of a child and "the inability alone is enough to satisfy this prong" of the statute). Nor had Father provided the child with any financial support in the

---

time despite knowing of Mother's drug use.

time period between the removal of the child and the filing of the petition, even when he had funds available to do so. *See **In re J'Khari F.***, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at *15 (Tenn. Ct. App. Jan. 31, 2019) ("[A] parent's actions can demonstrate a lack of willingness to assume custody of or financial responsibility for the Child."); *see also **In re Sydney B.***, 537 S.W.3d 452, 458 (Tenn. Ct. App. 2017) ("Parents are presumed to know they have a legal obligation to support their children. . . . The obligation to pay child support therefore exists even without a court order requiring the payment of child support." (citations omitted)).[13] And certainly, his ability to care for the child or financially support her had not improved between the filing of the petition and the trial. Moreover, Father candidly admitted at trial that even once incarceration is not an obstacle, he would still need time to find gainful employment and a place to live for himself and the child. So then, the trial court did not err in finding that Father did not have the ability to assume physical custody of the child or the willingness or ability to assume financial responsibility for the child.

We further conclude that returning the child to Father would pose a risk of substantial psychological harm to the child. The proof shows that Father was removed from the child's life when she was approximately thirteen months old. While Father asserts that DCS could have done more to facilitate a relationship between him and the child,[14] the unfortunate truth is that Father has had no visitation or contact of any kind with the child since September 2017. We have previously held that a risk of substantial harm is created by forcing a child to resume a relationship with "a virtual stranger[.]" ***In re Braelyn S.***, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020) (holding that reintroducing the father to the child would likely result in harm, even though the parent who filed the termination of parental rights petition was partly to blame for the lack of contact); *see also **In re Antonio J.***, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019) (holding that substantial harm could be established when a child was removed from a home when very young and had nightmares out of fear of being removed from his foster family); ***State v. C.H.H.***, No. E2001-02107-COA-R3-CV, 2002 WL 1021668, at *9 (Tenn. Ct. App. May 21, 2002) (holding that removal from the child's current family and placement with a near-stranger could constitute substantial harm)). Here, the proof shows that the child is bonded with her foster family and placed with her biological half-sibling. In contrast, Father has not been in the child's life for several years and the child never asks after Father. Under these circumstances, DCS met its burden to prove the second prong of this ground for termination. The trial court therefore did not err in terminating Father's parental rights under this ground.

---

[13] Father testified that he did financially support the child prior to his current incarceration.

[14] At oral argument, Father's counsel conceded that it was undesirable to immediately force the child to visit with Father in prison, but suggested the contact between Father and the child could have initially taken the form of letters. At the time Father was incarcerated, the child was little more than a year old.

## B. BEST INTEREST

Because we have determined that at least one statutory ground for terminating Father's parental rights has been proven, we must now decide if DCS has proven, by clear and convincing evidence, that termination of Father's rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). At the time the petition was filed in this case, the trial court was directed to consider the following non-exhaustive factors:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2020).

Father's sole argument on appeal as to best interest is that DCS did not make reasonable efforts to assist him. "[R]easonable efforts is referenced in one of the factors to be weighed in determining whether termination of parental rights is in the child's best

- 11 -

interest." ***In re Kaliyah S.***, 455 S.W.3d 533, 553 (Tenn. 2015). So then, reasonable efforts by DCS is simply one among the many factors that a trial court is to consider in making a best interest determination. And the relevancy and weight to be given to each factor depends on the unique circumstances of each case. ***In re Audrey S.***, 182 S.W.3d at 878. Here, it is true that DCS expended essentially no effort to assist Father. However, it is unclear what effect efforts would have had in this case, as no amount of effort by DCS could change the fact that Father was serving a lengthy prison sentence for a heinous crime. Still, for the sake of argument, we will concede that factor (2), involving the parent's changes after reasonable efforts by DCS, weighs against termination. There was also no proof as Father's mental or emotional status, so this factor also weighs against termination.[15] *See* Tenn. Code Ann. § 36-1-113(i)(8); ***In re Jayda J.***, 2021 WL 3076770, at *28 (holding that because no evidence was presented as to a factor, the factor weighed against termination).

The remaining factors, however, weigh in favor of termination. For example, due to Father's lengthy prison sentence, it is difficult to say whether Father has made a lasting adjustment of circumstances, given his prior history of criminal conduct and his decision to leave the child with a known drug user. *See* Tenn. Code Ann. § 36-1-113(i)(1). There can also be no dispute that Father's incarceration has made him unable to maintain visitation with the child. *See* Tenn. Code Ann. § 36-1-113(i)(3). As a result, Father has no meaningful relationship with the child and a change in caretakers from her bonded family to a virtual stranger would likely have a detrimental effect on her. *See* Tenn. Code Ann. § 36-1-113(i)(4), (5). Father also admitted that he once hit Mother with a broom while she was pregnant, he is currently serving an eight-year sentence for rape, and at the time of his rape conviction, he was already subject to the sex offender registry for some unknown conduct in his past. *See* Tenn. Code Ann. § 36-1-113(i)(6). There is also no dispute that Father currently has no physical home for the child and would need time to set one up upon his release. *See* Tenn. Code Ann. § 36-1-113(i)(7). And prior to the termination petition being filed, Father had not paid child support even in the limited instances in which he came into the funds to do so. *See* Tenn. Code Ann. § 36-1-113(i)(9).

In sum, the proof shows that through Father's criminal activity, he has removed himself from the child's life for such a period of time that he no longer has any relationship with her. Certainly, Father expressed his devotion to the child during his trial testimony and expressed his strong desire to parent her upon his hopefully-imminent release. In this part of the analysis, however, we do not focus on what is best for the parent, but what is best for the child. *See **In re Navada N.***, 498 S.W.3d 579, 607 (Tenn. Ct. App. 2016). Here, the child is in a safe, stable, and loving home with her half-sibling. She is bonded to this

---

[15] We do not take lightly that Father is serving a lengthy prison sentence for rape. However, due to the nature of Father's plea, we do not consider the facts that were alleged to have occurred with regard to that crime. Certainly, in appropriate cases, a parent's conviction for a serious crime could have implications for their mental and emotional fitness to parent a child.

family, whereas Father is little more than a stranger to her. And even when Father is released from prison, he will need time to fashion a life that is safe for the child. "The child, however, deserves, and can achieve, permanence now." *In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at \*12 (Tenn. Ct. App. Aug. 15, 2023) (citing *In re Da'Vante M.*, No. M2017-00989-COA-R3-PT, 2017 WL 6346056, at \*15 (Tenn. Ct. App. Dec. 12, 2017) ("Children deserve stability and an opportunity to move on from their present limbo.")). As such, we conclude that the trial court did not err in concluding that DCS established that termination of Father's parental rights was in the child's best interest by clear and convincing evidence.

## C. Dependency and Neglect Phase

In his brief, Father raises one more issue about the procedure: that he was never appointed counsel, did not participate in the dependency and neglect action, and was only allowed to appear for the termination trial via Zoom. We conclude that this issue lacks merit for a number of reasons.

First, although Father raises this issue in the statement of issues section of his brief, his brief does not contain any argument specifically addressing these concerns, nor does he cite any legal authority in support of his assertion of error. "An issue may be deemed waived, even when it has been specifically raised as an issue, when the brief fails to include an argument satisfying the requirements of [Tennessee Rules of Appellate Procedure] 27(a)(7)." *Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012).

Moreover, the question of whether a parent's due process rights were violated during a prior dependency and neglect proceeding is not a basis for reversal of a termination of parental rights when the parent's due process rights were protected in the termination proceeding: "any violation of [a parent's] due process rights . . . that may have occurred at the dependent and neglect proceeding [may be] fully remedied by the procedural protections provided . . . at the termination hearing." *In re S.Y.*, 121 S.W.3d 358, 366 (Tenn. Ct. App. 2003); *see also In re Hoover-Crawford*, No. M2000-01655-COA-R3-CV, 2001 WL 846044, at \*5 (Tenn. Ct. App. July 27, 2001) ("[A] trial court's decision should not be reversed for any deprivation of due process that occurred at an initial dependency and neglect proceeding when [the parent] was afforded full procedural protection at the termination proceeding."). The record makes clear that Father had counsel during the termination proceeding and both he and his counsel fully participated in the trial. Moreover, nothing in the record suggests that Father ever objected to the procedure by which he appeared at the termination trial via Zoom. Indeed, at an earlier hearing, Father's counsel did not object when a plan for Father to appear via Zoom was discussed. *See also In re Nevaeh K.*, No. E2023-01106-COA-R3-PT, 2024 WL 837943, at \*10 (Tenn. Ct. App. Feb. 28, 2024) ("We have previously discussed the applicability of Zoom to this statute, concluding that participation in this matter satisfies due process requirements. Moreover, we concluded then, as we do now, that Zoom affords an incarcerated parent ample

opportunity to participate in the termination proceedings." (citation omitted)). Because Father has not shown a deprivation of his due process rights in the termination proceeding, he is not entitled to reversal of the trial court's decision to terminate his parental rights on this basis.[16]

## IV. CONCLUSION

The judgment of the Houston County Juvenile Court is affirmed, and this cause is remanded for all further proceedings as may be necessary and consistent with this Opinion. Costs of this appeal are assessed to Appellant, Terry B., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

---

[16] That is not to say, however, that we are not troubled by the lack of effort made to have Father participate in the dependency and neglect action.